## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Gilbert Davis,                                    Civ. No. 10-2638 (DWF/JJK)

        Plaintiff,

v.                                                **REPORT AND**
                                                  **RECOMMENDATION**

Minneapolis Public Schools, Char
Algeo, Sylvia Luster, and Rosemary
Dedrich,

        Defendants.

Gilbert Davis, 1314 44th Ave. N. Apt. 421, Minneapolis, MN 55412, *pro se*.

Jeffrey A. Hassan, Esq., Jeffrey A. Hassan, PLC, counsel for Defendants.

JEFFREY J. KEYES, United States Magistrate Judge

This matter is before the Court on Defendants' Motion for Summary Judgment.  (Doc. No. 62.)  The motion has been referred to this Court for a Report and Recommendation under 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1. For the reasons stated below, this Court recommends that Defendants' motion for summary judgment be granted, and this case be dismissed with prejudice.

### INTRODUCTION

Plaintiff Gilbert Davis sued Defendant Minneapolis Public Schools ("MPS"), and the individually-named Defendants Char Algeo, Sylvia Luster, and Rosemary Dederichs, on various claims arising out of his employment at MPS.  Plaintiff

claims that while working at MPS, he was subjected to sexual harassment and a hostile work environment, and was discriminated against because of his sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").

Defendants counter that Plaintiff's hostile work environment claim should be dismissed because: (1) Plaintiff never reported the allegedly offensive conduct by his co-workers to his employer, and MPS was not otherwise on notice of the alleged incidents of harassment; (2) the incidents cited by Plaintiff fall short of establishing a hostile work environment; and (3) Plaintiff's claim is time-barred. Defendants also contend that Plaintiff's sex discrimination claim fails because: (1) Plaintiff did not suffer an adverse employment action; and (2) MPS had a legitimate business reason for placing Plaintiff on leave to undergo a fitness-for-duty examination due to Plaintiff's continuous disciplinary problems.   Finally, Defendants argue that Plaintiff's sexual harassment and sex discrimination claims against the individual Defendants must be dismissed because individuals—such as Plaintiff's co-workers or supervisors—cannot be held liable under Title VII.

## BACKGROUND

### Plaintiff's Employment with MPS

Plaintiff's employment with MPS spanned from 1986 to 2009. (Doc. No. 67, Ex. 5 ("Pl.'s Dep.") at 17–18.) Since 1991, Plaintiff had been a fulltime machine operator in MPS's Nutrition Center, where food is prepared and packaged for distribution to MPS schools. (*Id.* at 22; Doc. No. 67, Ex. 6, Aff. of

2

Maria Mason ("Mason Aff.") ¶ 3, Ex. A; Doc. No. 67, Ex. 8  Aff. of Sylvia Luster ("Luster Aff.") ¶¶ 2, 4; Doc. No. 82, Ex. A.[1])

### Plaintiff's Disciplinary Issues Before 2007

The record reflects Plaintiff's lengthy disciplinary history while working at MPS.  (Doc. No. 67, Mason Aff. ¶¶ 3, 4, Ex. A; Doc. No. 82, Ex. A.)  For example, Plaintiff was suspended for five days on February 29, 2000, for "being discourteous to [a] fellow employee [and] insubordination." (*Id.*)  On October 31, 2000, Plaintiff received a written reprimand and in May 2001, he was suspended for ten days for "being discourteous to [a] fellow employee, physical/mental abuse harassment, and violation of dept rules/procedures." (*Id.*)  Later, in November 2004, February 2005, October 2005, and November 2005, he received a series of "Verbal Notice[s] of Concern and Reminder[s] of Behavior Expectation" for verbal abuse of employees, performance issues, failing to follow work direction, neglect of his duties, and failure to follow work directions as assigned.  (*Id.*)  Between 1999 and 2007 Plaintiff also received several notices and written reprimands involving tardiness and attendance issues.  (*Id.*)

### Plaintiff's Disciplinary Issues in 2007–2008

---

[1]     Exhibits A–J to the Affidavit of Maria Mason (Doc. No. 67, Ex. 6), were inadvertently left out of the ECF filing in Doc. No. 67, but were nonetheless served on Plaintiff on July 22, 2011 in a timely fashion along with Defendants' summary judgment materials.  (Doc. No. 82, Affidavit of Jeffrey Hassan ("Hassan Aff.") ¶¶ 1–2.)  This Court was also timely served with hard copies of these exhibits.  On September 23, 2011, Defendants' counsel filed exhibits A–J to the Mason Affidavit on ECF.  (*Id.*)

In 2007, Plaintiff's co-worker, Defendant Algeo, assumed the position of machine operator.  (Doc. No. 67, Ex. 7, Aff. of Charlott Algeo ("Algeo Aff.") ¶ 3.)  Algeo had worked for MPS for a number of years prior to 2007, but did not work with Plaintiff before that time.   (*Id.*)  Plaintiff was responsible for training Algeo for the machine operator position.  (*Id.*)  In April 2007, Algeo complained to her Nutrition Center supervisors that, during this training, Plaintiff was "mean and rude towards her, that he called her an 'airhead,' that he said, 'fuck this and fuck that.'" (Doc. No. 67, Mason Aff. ¶ 6, Ex. B; Doc. No. 82, Ex. B.)   She also complained that Plaintiff, who is African-American, told her he could be "niggerish."   (*Id.*)   Algeo's April 21, 2007 statement to her supervisors specifically memorialized these complaints.  (*Id.*; Algeo Aff. ¶ 5 and Attach.)  MPS investigated Algeo's complaints and then met with Plaintiff on June 21, 2007, to discuss them.[2]  (Doc. No. 67, Mason Aff. ¶¶ 6, 8, Exs. A and B; Doc. No. 82, Exs. A and B.)   MPS's June 4, 2007 internal memorandum reflects that Plaintiff admitted to using the word "niggerish" with Algeo.  (*Id.*; *see also* Doc. No. 78, Reply Aff. of Maria Mason ("Mason Reply Aff."), ¶ 3 ("This fact is documented in the . . . hearing notes that I took on June 21, 2007.").)   Plaintiff, however, denies saying the word "niggerish" to Algeo in April 2007.  (Doc. No. 72, Pl.'s Mem. in Opp. to Summ. J. ("Pl.'s Mem.") at 27 of 118.)  Following the April 2007

---

[2]     Defendants refer to this and similar meetings as a "Loudermill Meeting," a due-process conference at which employees are informed of the issues or concerns regarding their conduct and are given an opportunity to respond.  (Doc. No. 67, Mason Aff. ¶ 4.)

altercation with Algeo, MPS suspended Plaintiff for three days.  (Doc. No. 67, Mason Aff. ¶ 8 and Ex. A.)

On June 22, 2007, the day after the Loudermill Meeting, Plaintiff filed a discrimination charge with the United States Equal Employment Opportunity Commission ("EEOC").   There, he alleged racial discrimination based on the April 2007 incident and the related MPS's disciplinary action.  (Doc. No. 67, Mason Aff. ¶ 9, Ex C; Doc. No. 82, Ex. C.)  The charge was referred to the Minnesota Department of Human Rights ("MDHR"), and subsequently dismissed. (*Id.*)

Shortly after Plaintiff returned to MPS after the summer break, he had another altercation with Algeo.   (Mason Aff. ¶ 10.)   Following the April 2007 incident between Plaintiff and Algeo, the machine operators' floor supervisor, Sylvia Luster, generally attempted to place them on separate assembly line teams.  (Doc. No. 67, Luster Aff. ¶¶ 2–5, 14.)   But on August 28, 2007, there was only one working assembly line, which meant that Plaintiff and Algeo had to work on the same line.   (*Id.*)   Although they were placed on the opposite ends of the assembly line, with several people in between, Plaintiff refused to work there, and told Luster that "You better get her off the line—I am not working with her." (*Id.* ¶ 14.)   Luster pointed out to Plaintiff that Algeo was not standing close to him and that they were not required to talk with each other.   (*Id.*)   But Plaintiff insisted that he wanted Algeo off the assembly line.   (*Id.*)   Luster then decided to take Plaintiff to the office of the managing supervisors, Defendants Rosemary

Dederichs and Irfan Chaudhary.  (*Id.*; *see also* Mason Aff. ¶ 10.)  Plaintiff refused

to cooperate with Dederichs and Chaudhary, the Nutrition Center's Director and

Assistant Director, when questioned about the incident.  (Doc. No. 67, Ex. 9, Aff.

of Rosemary Dederichs ("Dederichs Aff.") ¶¶ 2, 6; Ex. 10, Aff. of Irfan Chaudhary

("Chaudhary Aff.") ¶ 9; Luster Aff. ¶ 15.)

Because of Plaintiff's belligerence, insubordination, and failure to respond

to his supervisors' questions, he was placed on paid leave pending an

investigation of the incident.  (Doc. No. 67, Mason Aff. ¶ 10.)   While on leave,

Plaintiff amended his June 22, 2007 discrimination complaint with the EEOC to

further allege disability discrimination and retaliation for the April and August

2007 incidents with Algeo and concomitant suspensions.  (*Id.* and Ex. D; Doc.

No. 82, Ex. D.)  The EEOC dismissed both charges on October 31, 2007, and

the MDHR adopted the EEOC's disposition and likewise dismissed the Plaintiff's

complaint.  (*Id.* at Exs. C and D.)

Plaintiff was still on paid leave when MPS met with him on December 11,

2007 to discuss the August 28, 2007 incident.  (Doc. No. 78, Mason Reply Aff.

¶ 4, Ex. A.)   At that time, Plaintiff was given a seven-day suspension, which was

ultimately reduced on the condition that Plaintiff attend three sessions of anger

management counseling.  (Doc. No. 67, Mason Aff. ¶ 11.)

On December 12, 2007, Plaintiff was referred to clinical psychologist Karen

Leslie for an anger management assessment.   (*Id.* ¶ 12.)  After three sessions

with Plaintiff, Dr. Leslie recommended that Plaintiff undergo a complete

psychological evaluation. (*Id.*) Plaintiff did not return to work until January 4, 2008. (Doc. No. 78, Mason Reply Aff. ¶ 5, Ex. A.)

On January 25, 2008, Plaintiff was placed on paid administrative leave pending a fitness-for-duty psychological assessment. (Doc. No. 67, Mason Aff. ¶ 13, Ex. E.) Two months later, on March 26, 2008, Plaintiff underwent a psychological evaluation by clinical psychologist John Hung, PhD. (*Id.* ¶ 14, Ex. F; Doc. No. 82, Ex. F.) Dr. Hung concluded that Plaintiff was "not capable of meeting the job requirement . . . as listed in the position description" and that Plaintiff was "psychologically not capable of responding to reasonable supervision in a sufficiently appropriate and constructive manner to facilitate satisfactory job performance and in particular a non-hostile workplace environment." (*Id.*) On May 12, 2008, following the results of Dr. Hung's psychological evaluation, MPS met with Plaintiff to discuss his options. (*Id.* ¶ 15.) At that point, Plaintiff was advised that he could either: (1) go on a medical leave during which he could pursue an ADA accommodation or obtain a medical clearance—from a physician or psychologist of his choice—to return to work; or (2) elect a medical layoff because of his inability to perform the essential functions of his job. Plaintiff chose to go on a medical leave of absence until July 13, 2008. (*Id.*) After Plaintiff started his medical leave, he filed another discrimination complaint. But MDCR dismissed his claim concluding that "no probable cause exists to believe that the allegations of discrimination are well-founded." (*Id.*, Ex. G.)

On July 3, 2008, Plaintiff sought an ADA accommodation.  (*Id.* ¶ 16.)  He also requested and was granted an extension of his leave of absence until November 25, 2008.  (*Id.*)  Plaintiff's ADA accommodation request was denied on October 14, 2008, because his own mental health care provider concluded that Plaintiff "is unable to perform any kind of work at this time [and] recommended that he not return to work until adverse symptoms and self regulation improve."  (*Id.*, Ex. H.)    Ultimately, by the time Plaintiff's leave of absence expired on November 25, 2008, he had obtained neither an ADA accommodation nor clearance to return to work, and so he was deemed "absent without being on approved leave" ("AWOL").  (*Id.* ¶¶ 16–17.)

On April 15, 2009, MPS met with Plaintiff to discuss his AWOL status and gave him another opportunity to obtain the documents required to clarify his AWOL status.  (*Id.* ¶ 17.)  Plaintiff again did not provide any requisite documentation to MPS.  (*Id.*)  Under the terms of the collective bargaining agreement, Plaintiff was subject to layoff or termination.  (*Id.*)   On April 29, 2009, MPS notified Plaintiff that he was laid off from employment with MPS effective April 28, 2009.  (*Id.* and Ex. J.)

### Plaintiff's EEOC Complaint Underlying this Action

On November 18, 2008, Plaintiff filed a Charge of Discrimination against MPS with the Minneapolis Department of Civil Rights ("MDCR") alleging sex discrimination and sexual harassment.  (Doc. No. 67, Ex. 2 at 2.)   This Charge of Discrimination was cross-filed with the EEOC.  (*Id.* at 3.)   On July 30, 2009, the

MDCR found that Plaintiff's "allegation of sexual harassment fails as a whole" and dismissed Plaintiff's Charge.  (*Id.*, Ex. 3 at 2, 4.)   On March 30, 2010, the EEOC adopted the MDCR's findings, dismissed Plaintiff's Charge, and notified Plaintiff of his right to sue.  (*Id.*, Ex. 4.)   On June 28, 2010, Plaintiff initiated the present action by filing the Complaint with this Court.  (Doc. No. 1.)[3]

**Plaintiff's Federal Court Action**

Although some of Plaintiff's claims are difficult to comprehend, this Court construes Plaintiff's pleadings and written submissions to allege that he was subjected to sexual harassment and hostile working environment while working at MPS.  Plaintiff's claims are based on the following actions allegedly taken by Algeo:  (1) offering Plaintiff her ex-husband's diamond bracelet in exchange for Plaintiff's calling her; (2) bringing Plaintiff chocolate items, including a "double-Dutch chocolate cake with cherries on top"; (3) giving Plaintiff "chicken drummies"; (4) giving Plaintiff souvenirs from various trips, including one mermaid-shaped souvenir and another item with "It's About Time" written on it; (5) inviting Plaintiff and his daughter on trips with her and her niece; (6) broadcasting "Hey, can't nobody have Gilbert.  Gilbert is mine!" throughout the Nutrition Center; (7) talking to Plaintiff about her dildo; and (8) performing a

---

[3]      Plaintiff's Complaint was filed on June 28, 2010.  It includes a five-page, hand-written statement that further details his interactions with Algeo and his supervisors.  (Doc. No. 1, Attach. 1.)   On June 29, 2010, Plaintiff filed an Amended Complaint without any hand-written attachment.  (Doc. No. 3, Am. Compl.)  In light of Plaintiff's *pro se* status, this Court will construe Plaintiff's hand-written statement filed in connection with the original pleading as part of the summary judgment record.

sexually suggestive "buck wild" dance for Plaintiff at the Nutrition Center.  (Doc. No. 67, Pl.'s Dep. at 55–63, 65–66; Doc. No. 3, Am. Compl. ¶ 10; Doc. No. 1, Attach. 1.)   Plaintiff does not allege that Luster, Dederichs or any of his supervisors sexually harassed him.   And he concedes that he never complained about Algeo's conduct from November 2007 to January 2008 to Dederichs, Chaudhary, or any of the managing supervisors because "he felt as though they would not do anything about the situation."  (Pl.'s Dep. at 55; Doc. No. 67, Ex. 2 at 2).   But Plaintiff claims that MPS knew about Algeo's purportedly sexually harassing conduct.  (Pl.'s Dep. at 54; Doc. No. 72, Pl.'s Mem. 9, 84).

In support of Defendants' summary judgment motion, they submit affidavits by Algeo, Luster, and Dederichs, among others.   There, Algeo admits that she typically brought trip souvenirs for most of her co-workers, including Plaintiff. (Doc. No. 67, Algeo Aff. ¶¶ 4, 6, 7.)   She also states that she brought food to share with her co-workers, but denies that she ever brought food for Plaintiff alone.  (*Id.* ¶ 6.)   And she categorically denies the remaining allegations lodged in Plaintiff's Complaint.  (*Id.*)  Luster's testimony is consistent with Algeo's account of her conduct toward Plaintiff.  (Doc. No. 67, Luster Aff. ¶¶ 19–20.)   In addition, Luster specifically denies observing anything related to the January 25, 2008 "buck wild" dance episode, and specifically denies talking with Plaintiff about it or asking Algeo to stop her conduct on that date.   (*Id.* ¶¶ 16–17; Doc. No. 67, Ex. 11, Aff. of Arlene Letendre ("Letendre Aff.") ¶¶ 1–2.)  Luster also states that:

> In reading Mr. Davis' complaint, it looks like he is relating the incident in which Ms. Algeo is alleged to have been moving in a sexual manner in January 2008, to when he told Ms. Algeo that he could be "niggerish" in April 2007.  However, that never happened. Contrary to Mr. Davis' allegations, I never went to Ms. Algeo and stopped her from doing anything.  She actually came up to me when Mr. Davis made his comment about being "niggerish;" but, this occurred in April 2007—not January 2008.

(Luster Aff. ¶ 18; Doc. No. 78, Mason Reply Aff. ¶¶ 5–7.)   Indeed, MPS's attendance records show that Plaintiff was not even at work on January 25, 2008.  (Mason Reply Aff. ¶¶ 6–7, Ex. A.)   Lastly, Dederichs declares that she had no knowledge whatsoever of Algeo's purportedly sexually harassing conduct and that Plaintiff never complained about sexual harassment from November 2007 to January 2008.  (Doc. No. 67, Dederichs Aff. ¶ 13.)

In addition to construing Plaintiff's Complaint to allege a claim for sexual harassment/hostile work environment, this Court—in light of Plaintiff's *pro se* status—will assume that Plaintiff is attempting to raise a claim for sex discrimination based on his placement on administrative leave pending the fitness-for-duty evaluation by MPS.

## DISCUSSION

### I.     Standard of Review

Summary judgment will be granted when the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.   *Enter. Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996).  The nonmoving party must demonstrate the existence of specific

facts in the record that create a genuine issue for trial.   *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 256 (1986); Fed. R. Civ. P. 56(e); *Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005) ("A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor."), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc).

Notably, a *pro se* plaintiff's unsubstantiated assertions cannot overcome a motion for summary judgment.  *Ramirez v. Harmon*, No. 03-5284 (JRT/AJB), 2006 WL 2583106, *2 (D. Minn. Sept. 1, 2006) (stating that "the *pro se* plaintiff still must present evidence to defeat a properly supported summary judgment motion and may not rely upon conclusory allegations and unsupported assertions") (citing *Dunavant v. Moore*, 907 F.2d 77, 80 (8th Cir.1990)); *Barbee v. Cntr. Parking Sys., Inc.*, No. 06-1716, 2008 WL 5101008, *6 (E.D. Mo. Nov. 26, 2008) ("Although Plaintiff submitted portions of her deposition transcript, Plaintiff's own, self-serving deposition testimony is insufficient to defeat Defendant's motion for summary judgment.").   "Only disputes over facts that might affect the outcome of the suit under the governing substantive law will

preclude the entry of summary judgment." *Ordahl v. Forward Tech. Indus., Inc.*,
301 F. Supp. 2d 1022, 1025 (D. Minn. 2004).

Finally, the Eighth Circuit recently clarified that "[t]here is no 'discrimination
case exception' to the application of summary judgment, which is a useful pretrial
tool to determine whether any case, including one alleging discrimination, merits
a trial." *Torgerson*, 643 F.3d at 1042–43, 1058 (citations omitted).   "Although
employment discrimination cases are 'often fact intensive and dependant on
nuance in the workplace, they are not immune from summary judgment.'"
*Trierweiler v. Wells Fargo Bank*, 639 F.3d 456, 459 (8th Cir. 2011) (quoting
*Fercello v. Ramsey Cnty.*, 612 F.3d 1069, 1077 (8th Cir. 2010)); *see also Smith
v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1082–83 (8th Cir. 2010) ("[N]o
separate summary judgment standard exists for discrimination or retaliation
cases and . . . such cases are not immune from summary judgment.").

## II.    Analysis

### A.    Individual Liability

Plaintiff relies on Title VII to advance discrimination and/or harassment
claims against all Defendants.  The individually-named Defendants argue that
they cannot be liable for these federal law claims.  This Court agrees.  The
Eighth Circuit has made clear that individual employees may not be individually
liable under Title VII.  *See Van Horn v. Best Buy Stores, L.P.*, 526 F.3d 1144,
1147 (8th Cir. 2008) (noting that Title VII provides for actions against employers
not supervisors); *Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074, 1079 (8th Cir.

2006) ("Title VII addresses the conduct of employers only and does not impose liability on co-workers[.]") (citing *Smith v. St. Bernards Reg'l Med. Ctr.*, 19 F.3d 1254, 1255 (8th Cir. 1994); *Breen v. Norwest Bank Minn., N.A.*, 865 F. Supp. 574, 578 (D. Minn. 1994) ("Title VII does not impose individual liability on employees.")  The term employer, as defined under Title VII, is "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year, and any agent of such a person . . . ." 42 U.S.C. § 2000e(b). None of the individually-named Defendants is an employer within the meaning of Title VII.   Accordingly, this Court recommends that all Title VII claims asserted against them be dismissed with prejudice.

### B.    Whether Plaintiff's Claims are Time-Barred

MPS argues that Plaintiff's sexual harassment and sexual discrimination claims are time-barred because Plaintiff did not file his Title VII discrimination charge within 300 days of the alleged wrongdoing that formed the basis of his claim.   *Gordon v. Shafer Contracting Co., Inc.*, 469 F.3d 1191, 1194 (8th Cir. 2006) (citing 42 U.S.C. § 2000e-5(e)(1)).   Plaintiff filed his Charge of Discrimination with the EEOC on November 18, 2008, well within 300 days of January 25, 2008, the date when Plaintiff says that the "buck wild" dance incident occurred.   But MPS contends that this incident could not have occurred on January 25, 2008.   If it occurred at all, MPS argues, it must have been on April 18, 2007.   It reaches this conclusion by pointing out that Plaintiff has claimed that

he used the word "niggerish" on the same day as the "buck wild" incident, and there is documentary evidence in the case showing that Plaintiff made his statement about how he could be "niggerish," for which he claims that he was disciplined, on April 18, 2007.   Therefore, MPS argues, the sexual harassment of the "buck wild" incident must have occurred on April 18, 2007, more than 547 days before Plaintiff filed his charge with the EEOC.   MPS also submits Plaintiff's employment record, which indicates that Plaintiff was not even at work on January 25, 2008.

This Court finds that whether Plaintiff uttered the word "niggerish" in April 2007 or January 2008 is irrelevant for the purposes of the current sex discrimination and sexual harassment lawsuit.   Whether Plaintiff used a racial epithet on January 25, 2008 does not affect his current claims.   Nor does it create a genuine issue of material fact, because only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment.   *Ordahl*, 301 F. Supp. 2d at 1025.   Even assuming the alleged sexual harassment, including the "wild buck" incident, took place when Plaintiff claims it did, on January 25, 2008, the relevant inquiry is whether the alleged conduct rose to the level of hostile work environment or sex discrimination.   As explained below, this Court concludes it did not.

### C.   Sexual Harassment/Hostile Work Environment

Title VII prohibits employers from discriminating against any individual based on sex with respect to his or her compensation, terms, conditions, or privileges of employment.  42 U.S.C. § 2000e-2(a)(1).  "Discrimination based on sex that creates a hostile or abusive working environment violates Title VII." *Weger v. County of Ladue*, 500 F.3d 710, 718 (8th Cir. 2007) (quoting *Nitsche v. CEO of Osage Valley Elec. Coop.*, 446 F.3d 841, 845 (8th Cir. 2006)).  To succeed on a hostile work environment claim based on sexual harassment by a non-supervisory co-worker Plaintiff must show that:  (1) he belonged to a protected group; (2) he was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known about the harassment and failed to take proper remedial action.  *Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 979 (8th Cir. 2003).

Because the parties do not appear to contest that Plaintiff was a member of a protected group, that the alleged harassment was based on sex, or that the alleged incidents were unwelcome by Plaintiff, this Court will focus on the two remaining elements.[4]  After reviewing the record and drawing all reasonable

---

[4]     "The based on sex requirement forces a plaintiff to prove that [he] was the target of harassment because of [his] sex and that the offensive behavior was not merely non-actionable, vulgar behavior." *Pedroza v. Cintas Co. No. 2*, 397 F.3d 1063, 1068 (8th Cir. 2005).  "This distinction exists because 'Title VII does not prohibit all verbal or physical harassment in the workplace' and is not a 'general

inferences in favor of Plaintiff, this Court finds that the alleged incidents do not rise to the level of severe or pervasive conduct necessary to establish a hostile work environment claim.   Nor did Plaintiff establish a genuine issue of material fact as to whether MPS knew or should have known regarding the sexual harassment incidents that Plaintiff had not reported to its management.

"Hostile work environment claims are limited in nature, requiring a high evidentiary showing that the plaintiff's workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Vajdl v. Mesabi Acad. of KidsPeace, Inc.*, 484 F.3d 546, 549–50 (8th Cir. 2007) (internal quotations and citations omitted).   Harassment affects a term, condition, or privilege of employment when it makes the work environment objectively and subjectively hostile; that is, when a reasonable person would find the conduct hostile or abusive, and the plaintiff actually perceives it as such. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993).   The Court determines whether the work environment is objectively hostile by looking at all the

_____

civility code for the American workplace."' *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).   Thus, to succeed on a hostile work environment claim, Plaintiff must demonstrate "that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex." *Id.* (internal quotations and alterations omitted). This Court notes that the majority of Plaintiff's allegations likely do not satisfy this prong of the hostile work environment standard.

circumstances, including the frequency and severity of the discriminatory conduct; "whether [the conduct] is physically threatening or humiliating, or a mere offensive utterance; and whether [the conduct] unreasonably interferes with an employee's work performance." *Id.* at 22–23.

To overcome summary judgment, Plaintiff "must present evidence from which a reasonable jury could find that [the] conduct towards [him] was more than merely offensive, immature or unprofessional." *Henthorn v. Capitol Commc'ns, Inc.*, 359 F.3d 1021, 1027 (8th Cir. 2004). This task is not insignificant in light of the Eighth Circuit's high threshold for actionable harm that ensures that Title VII is not used as a vehicle for imposing a general code of workplace civility. *See Willis v. Henderson*, 262 F.3d 801, 809 (8th Cir. 2001) (stating that it is not Title VII's function to remedy mere unpleasant and rude behavior); *Henthorn*, 359 F.3d at 1027-28 (finding that stating that plaintiff was "hot," repeatedly requesting dates and calling the plaintiff at home did not constitute a hostile work environment in the absence of lewd or threatening comments, inappropriate touching, or sexual propositions); *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 933–34 (8th Cir. 2002) (stating that making advances and propositioning a relationship with plaintiff, forcing the plaintiff to go with him to a bar, improper hand-touching on multiple occasions, asking the plaintiff to sketch a phallic-themed planter, and displaying chauvinistic posters and a pornographic computer screen did not constitute a hostile work environment); *Alagna*, 324 F.3d at 980 (frequent calls to plaintiff's home,

18

complimenting plaintiff on her looks, regular visits to her office, the bestowing of gifts, the touching of plaintiff's arm, and the frequent expressions of "I love you" and that plaintiff was "very special" did not constitute a hostile work environment).

Here, Plaintiff alleges that the following conduct by Algeo amounted to sexual harassment-based hostile work environment: (1) offering Plaintiff her ex-husband's diamond bracelet in exchange for Plaintiff's calling her; (2) bringing him cans of cocoa powder, and a "double-Dutch chocolate cake with cherries on top"; (3) giving Plaintiff "chicken drummies"; (4) giving Plaintiff souvenirs from various trips, including a key-ring in the shape of a mermaid; (5) inviting Plaintiff and Plaintiff's daughter to go on trips with her and her niece; (6) broadcasting "Gilbert is mine" on the work floor; (7) talking about her dildo; and (8) performing a "buck wild" dance in front of Plaintiff, and moving her body in a sexually suggestive manner on one occasion.  (Doc. No. 67, Pl.'s Dep. at 55–63, 65–66; *see* Doc. No. 3, Am. Compl. ¶ 10.)  This Court disagrees.

Having examined the totality of the circumstances, this Court concludes that even assuming that the above conduct occurred and that Algeo's actions and comments were inappropriate, immature, or embarrassing, they do not cross the high threshold required to support a claim of sexual harassment.   For example, Algeo's alleged food offerings to Plaintiff, even if unwelcome, were not severely intimidating, insulting or offensive.  Further, the comments Algeo allegedly made about her sexual activities and her dildo—while embarrassing and inappropriate—were not sufficiently derogatory or demeaning to permit a

finding of hostile work environment.   And even the conduct involving the "buck wild" dance with its allegedly "gyrating" body movements and "tongue licking" was not so severe or extreme to amount to hostile work environment – even when considered in combination with other allegations of harassment.  There is no evidence that Plaintiff was physically threatened, or that these occurrences unreasonably disrupted Plaintiff's work performance or that they rose to the level of severe or pervasive conduct altering the conditions of Plaintiff's employment. Indeed, the Eighth Circuit has rejected hostile work environment claims based on facts more egregious than those presented here.  *See Alagna*, 324 F.3d at 996– 98 (finding male teacher's inappropriate conduct toward female faculty member over two school years, such as touching her, commenting on her appearance, saying "I love you," exhibiting a demeanor of a sexual nature, calling her many times at home, and giving her two romance novels and another gift, was "not sufficiently severe or pervasive"); *LeGrand v. Area Res. for Cmty and Human Servs.*, 394 F.3d 1098, 1100–03 (8th Cir. 2005) (finding no severe or pervasive sexual harassment where plaintiff was asked to watch pornographic movies with a board member and "jerk off," was kissed on the mouth, had his buttocks and thigh grabbed, and experienced a suggestive reach toward, and hand brush-up against his genitals); *Duncan*, 300 F.3d at 933–34 (finding that making advances, soliciting a relationship, inappropriate hand-touching on multiple occasions, asking the plaintiff to sketch a phallic-themed planter, and displaying chauvinistic posters did not constitute a hostile work environment).   Considered as a whole,

Algeo's alleged conduct, however inappropriate, was not sufficiently severe or pervasive to satisfy the high threshold for actionable harm.   Simply put, when considering the facts in a light most favorable to Plaintiff, there are no facts from which a reasonable jury can find hostile work environment and thus summary judgment should be granted.

Plaintiff's hostile work environment also fails because he cannot show that MPS knew or should have known of the alleged sexual harassment incidents by Algeo and failed to take a remedial action.   Plaintiff concedes that he never reported the harassment to MPS's management.   He himself alleges that more than half of alleged sexual harassment incidents occurred with no one around. Plaintiff contends that MPS knew about the remaining incidents because they took place on the open floor of the Food Center and were therefore visible to other MPS employees.   But there is simply no evidence in the record to support that.   Plaintiff also alleges that Sylvia Luster saw the January 25, 2008 "buck wild" dance incident, but Luster categorically denies any knowledge of the incident and Plaintiff's employment records show that he was not even at work on that day.   Based on these facts, Plaintiff's self-serving testimony that MPS should have known about the alleged incidents is insufficient to withstand summary judgment.   *See Bass*, 418 F.3d at 873 (stating that the mere scintilla of evidence is insufficient to withstand summary judgment).

### D.    Sex Discrimination

Plaintiff's employment sex discrimination claim under Title VII is analyzed

using the familiar burden-shifting analysis set forth in *McDonnell Douglas Corp.*

*v. Green*, 411 U.S. 792, 802 (1973); *Carraher v. Target Corp.*, 503 F.3d 714, 716

(8th Cir. 2007).   Under that analysis, a plaintiff with a discrimination claim bears

the burden of establishing a prima facie case of discrimination.  *McDonnell*

*Douglas*, 411 U.S. at 802.  Specifically, in this case Plaintiff must establish that:

(1) he is a member of a protected group; (2) he was meeting the legitimate

expectations of MPS; (3) he suffered an adverse employment action; and (4)

circumstances exist that create an inference of discrimination.   *Carter v. Dayton*

*Rogers Mfg. Co.*, 543 F.Supp.2d 1026, 1033 (D. Minn. 2008).  The fourth

element can be met by demonstrating that MPS did not take similar actions

against employees who were not members of the protected class.   *Id*.

Further, in a reverse discrimination case such as this, the Eighth Circuit

also requires the plaintiff to show that "'background circumstances support the

suspicion that the defendant is that unusual employer who discriminates against

the majority.'"  *Hammer v. Ashcroft*, 383 F.3d 722, 724 (8th Cir. 2004) (quoting

*Duffy v. Wolle*, 123 F.3d 1026, 1036 (8th Cir. 1997)); *Woods v. Perry*, 375 F.3d

671, 673 (8th Cir. 2004) (same).   A plaintiff can show suspicious background

circumstances by providing evidence that the defendant is "inclined to

discriminate invidiously against males or something 'fishy' about the facts that

raises an inference of discrimination."  *Woods*, 375 F.3d at 674.  As in any

employment discrimination case, the ultimate burden of persuasion remains at all times with the plaintiff.  *Id.*

 If Plaintiff establishes a prima facie case of discrimination, MPS must rebut that showing by presenting evidence of a legitimate, non-discriminatory reason for placing Plaintiff on leave and requiring him to submit to a fitness-for-duty examination.  *Coffman v. Tracker Marine*, 141 F.3d 1241, 1245 (8th Cir. 1998).   If MPS can make this showing, Plaintiff must then prove that the reasons offered by MPS are pretextual and that illegal discrimination was a "motivating reason" for MPS's actions.  *Id.*

This Court finds that Plaintiff cannot establish the elements of his *prima facie* case of sex discrimination.   First, Plaintiff cannot show that MPS "is the unusual employer who discriminates against men."  *Hammer*, 383 F.3d at 724. For one, aside from Plaintiff's self-serving allegations, and the fact that some of Plaintiff's co-workers and supervisors were women, there is no evidence to support an inference of discrimination against men or to establish that MPS is the unusual employer that discriminates against men.   Second, MPS has come forward with evidence that Plaintiff had serious disciplinary issues and was not meeting the legitimate expectations of his employment.   In particular, the evidence shows that Plaintiff:  (1) was repeatedly late or absent from work; (2) was rude and belligerent to his supervisors; (3) refused to comply with direct orders of his supervisors on numerous occasions; (4) was rude and disrespectful to his co-workers on numerous occasions; (5) uttered profanities to his co-

workers; and (6) used a racial epithet toward a co-worker on at least one occasion in direct violation of MPS's policy.   Further, the evidence shows that because of this abusive behavior toward supervisors and co-workers, Plaintiff was referred to anger management assessment with clinical psychologist Karen Leslie.   After three sessions with Plaintiff, Dr. Leslie recommended that Plaintiff undergo a complete psychological examination to determine whether he could safely and effectively perform his essential job functions.   As a result, Plaintiff was placed on paid administrative leave, pending a fitness-for-duty evaluation by John Hung, a clinical psychologist.   After completing Plaintiff's psychological examination, Dr. Hung concluded that Plaintiff was "not capable of meeting the job requirements . . . as listed in the position description . . . [a]nd that [he] is psychologically not capable of responding to reasonable supervision in a sufficiently appropriate and constructive manner to facilitate satisfactory job performance and in particular a non-hostile workplace environment." (Doc. No. 67, Mason Aff. ¶ 13, Ex. F; Doc. No. 82, Ex. F.)  Plaintiff, in turn, offers no evidence from which a reasonable jury could determine that he was qualified to perform his job functions at MPS.

Plaintiff has also failed to show with admissible evidence that other employees who were not members of the protected class were treated differently.  To the extent Plaintiff contends that female employees were not disciplined when they committed similar infractions, Plaintiff has provided no evidence relating to any female employee with whom he wishes to be compared.

There is no evidence that female employees with comparable disciplinary history were treated differently, were not punished for their infractions, and were not subjected to the fitness-for-duty evaluation.  Beyond that, there is no evidence in the record that gives rise to an inference of discrimination.   With discovery now complete, there is no evidence in the record from which a reasonable juror could conclude that Plaintiff was treated differently than similarly situated female employees.

A fitness-for-duty examination does not necessarily constitute an adverse employment action.  *See Schoffstall v. Henderson*, 223 F.3d 818, 825 (8th Cir. 2000) (finding fitness-for-duty examination was not an adverse employment action under the circumstances of the case); *see also Vislisel v. Turnage*, 930 F.2d 9 (8th Cir. 1991) (expressing doubt whether requiring employee to submit to physical and, if necessary, psychiatric examination was an adverse employment action).   Eighth Circuit law requires the plaintiff to show that the adverse employment activity "produced significant harm" or "materially significant disadvantage." *See Buboltz v. Residential Advantages*, *Inc.,* 523 F.3d 864, 868 (8th Cir. 2008); *Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 786 (8th Cir. 2007) ("Termination, cuts in pay or benefits, and changes that affect an employee's career prospects are significant enough to meet this standard, as are circumstances amounting to a constructive discharge.")[5]

---

[5]      This Court finds that to the extent that any constructive discharge claim can be read into Plaintiff's Complaint, it is equally meritless.  "To prove a case of

constructive discharge, a plaintiff must show (1) a reasonable person in his situation would find the working conditions intolerable, and (2) the employer intended to force him to quit." *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 616 (8th Cir. 2007).   Assuming Plaintiff's constructive discharge claim is premised on the same allegations this Court already found insufficient to establish a hostile work environment, his claim plainly fails.   As discussed in the context of Plaintiff's sexual harassment claim, his working conditions were far from reasonably intolerable as a matter of law.  *See Horn v. Univ. of Minn.*, 362 F.3d 1042, 1047 (8th Cir. 2004) (applying Title VII standard to "intolerable working conditions"); *Jones v. Fitzgerald*, 285 F.3d 705, 716 (8th Cir. 2002) ("Constructive discharge requires considerably more proof than an unpleasant and unprofessional environment.").  Nor can Plaintiff show that the placement on administrative leave pending the results of his fitness-for-duty evaluation amounted to constructive discharge.  First, there is nothing per se abusive or intolerable about that action.  And there is no evidence that by placing Plaintiff on paid administrative leave and requiring him to undergo a fitness-for-duty evaluation, MPS intended to force Plaintiff to quit.  Instead, the evidence here shows that MPS repeatedly met with Plaintiff to discuss his options, and provided Plaintiff with several opportunities to obtain ADA accommodations or clearance to return to work.  MPS even gave Plaintiff a chance to clear his AWOL status after he was AWOL for months.  *See Devin*, 491 F.3d at 790 (stating that employer's willingness to discuss options with employee "undercuts any claim of constructive discharge"); *EEOC v. City of Ind., Mo.*, 471 F.3d 891, 896 (8th Cir. 2006) (same).

This Court also notes that it does not interpret Plaintiff's Complaint to allege a retaliation claim under Title VII.  But even assuming he raises such a claim, it fails because, among other things, MPS proffered a legitimate non-discriminatory reason for placing Plaintiff on leave and requiring him to undergo a fitness-for-duty evaluation, and Plaintiff has no evidence to show that MPS's reason was pretextual.  *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 736 (8th Cir. 2009) (concluding that Defendant "had many legitimate reasons for firing [Plaintiff]; therefore Satcher's retaliation claim fails").  Here, the fitness-for-duty examination was prompted not by Plaintiff's discrimination complaints but by his behavior.

Plaintiff argues that "usually when a place of business request [sic] a fitness for duty evaluation on you (1) they will terminate you or (2) lay you off. [E]ither option you are screwed; Who's gonna hire you . . . the company don't want you back."   (Doc. No. 72, Pl.'s Mem. at 103–04.)   But there is no evidence—other than Plaintiff's suppositions—that MPS would not have restored Plaintiff in his job or provided some type of appropriate accommodation had Plaintiff submitted the necessary paperwork.

Plaintiff was placed on paid leave pending his psychological evaluation, and there is no evidence that his employment pay, grade, or benefits were altered at that time.   After the evaluation results came in, MPS specifically met with Plaintiff to discuss his options.   MPS informed Plaintiff that he could take a medical leave, during which he could either pursue an ADA accommodation or see another physician of his own choice to get clearance to return to work. Plaintiff sought an ADA accommodation, which was denied because his own health care provider found that "Mr. Davis is unable to perform any kind of work at this time and "recommended that he not return to work until adverse symptoms and self regulation improve."  (Mason Aff. ¶ 14, Ex. H; Doc. No. 82, Ex. H.) When Plaintiff's medical leave expired on November 25, 2008, Plaintiff submitted no documents for a leave extension request; nor did he provide clearance from his health care provider to return to work.   Nonetheless, on April 15, 2009, MPS

gave Plaintiff another opportunity to provide the requisite documents to clear his AWOL status. But Plaintiff never submitted the required mental health clearance. In fact, he concedes that he *himself* chose not to come back to MPS despite the fact that "Dr. and counslor [sic] [ ] were willing to give Mr. Davis a clearance letter . . . Mr. Davis made a decession [sic] to not return to a hostile working environment, so that he would not [sic] never ever have to keep going thru the same harm or worse stuff. The district can keep their hostile work environment." (Doc. No. 72, Pl.'s Mem. at 114 of 118.) Thus, the record shows that it was Plaintiff, not MPS who ultimately terminated his employment. Under these circumstances, this Court finds that requiring Plaintiff to submit to a fitness-for-duty evaluation was not an adverse employment action.

But even assuming that a submission to a fitness-for-duty exam was an adverse action, Plaintiff's claim still fails because MPS proffered a legitimate non-discriminatory reason for its action, and the record amply supports the legitimate, non-retaliatory nature of its explanation. Plaintiff relies on self-serving innuendo and speculation, which does not suffice to survive summary judgment, especially because "only disputes over facts that might affect the outcome of the suit under the governing substantive law will preclude the entry of summary judgment." *Ordahl*, 301 F. Supp. 2d at 1022.

As described above, MPS explained that it placed Plaintiff on leave and required him to undergo a fitness-for-duty evaluation because of his long history of disciplinary problems, a profound inability to get along with co-workers,

insubordination, absenteeism, use of profanity and racial epithets, and other work-related issues. *See Bell v. American Greetings Corp.*, No. 04-303, 2007 WL 496635, at \*3 (E.D. Ark. Feb. 12, 2007) ("The Eighth Circuit has held that excessive absences qualify as a legitimate, non-discriminatory reason for termination.") (citing *Al- Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1037 (8th Cir. 2005) (holding that termination for excessive absences constituted a legitimate, non-discriminatory reason for adverse action)); *Bainbridge v. Loffredo Gardens, Inc.*, No. 02-40192, 2003 WL 21911063, at \*9 (S.D. Iowa July 31, 2003) (stating that the inability to get along with co-workers is a legitimate, non-discriminatory reason to terminate an employee's employment).

Ultimately, Plaintiff's complaints about MPS's decision to place him on administrative leave pending a fitness-for-duty psychological evaluation boil down to nothing more than an attack on MPS's business practices based on his subjective opinion. For example, Plaintiff opines that "usually when a place of business request [sic] a fitness for duty evaluation on you (1) they will terminate you or (2) lay you off." (Doc. No. 72, Pl.'s Mem. at 103–04.) Plaintiff also disagrees with MPS's business practices and complains that:

> [t]he district is very weak in rotating people in the Food Service [D]ept. when you have a problem with one person, instead of separating the people, they keep the people together . . . [T]here is no organization within the nutrition center, you have adult's [sic] there playing with flying monkeys toyes [sic] . . . talking about their co-workers, clothings [sic], shoes, socks, shirts, pants . . . Some people don't [sic] wear hair restraints . . . [T]hese are grown-ups acting like 4-5 yr. old childrens [sic].

(*Id.*)   Plaintiff's disagreement with MPS's work structure or management system is grounded in his subjective opinion about "best practices" for running the district's food center – not anything that evinces sex discrimination.   But "the employment discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination."  *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995); *Day v. Johnson*, 119 F.3d 650, 657 (8th Cir. 1997) ("[F]ederal courts are not self-appointed personnel managers, and they may not second-guess the fairness or wisdom of an employer's nondiscriminatory employment decisions.")

Indeed, Title VII prohibits intentional discrimination based on certain classifications – not "employment decisions based on other factors, such as job performance, erroneous evaluations, personality conflicts, or even unsound business practices."  *Rose-Maston v. NME Hosp. Inc.*, 133 F.3d 1104, 1108–109 (8th Cir. 1998).  Thus, in determining whether an employer's justification for not hiring an employee is pretextual, this Court does not examine whether an employer's reason for that decision was a correct business judgment but rather whether it honestly acted on that reason.  *See McKay v. U.S. Dep't of Transp.*, 340 F.3d 695, 700 (8th Cir. 2003) (stating that a "pretext inquiry is limited to whether the employer gave an honest explanation of its behavior, not whether its action was wise, fair or correct"); *Tanner v. Entergy Ark.*, No. 08-99,

2009 WL 1955232, at *4 (E.D. Ark. July 6, 2009) ("[T]he proper inquiry is not whether Entergy was factually correct in determining that Walker's company had a history of poorly performing work for Entergy; rather the proper inquiry is whether Entergy honestly believed that Walker had such a history.").   Here, Plaintiff has failed to offer any admissible evidence on pretext to show that MPS's reasons for placing him on leave or subjecting him to the psychological evaluation had anything to do with his gender.   Plaintiff's sex discrimination claims fail as a matter of law.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.    Defendants' Motion for Summary Judgment (Doc. No. 62), be

**GRANTED**; and

2.    This case be **DISMISSED WITH PREJUDICE.**


Date: October 13, 2011                              */s Jeffrey J. Keyes*_____
                                                    JEFFREY J. KEYES
                                                    United States Magistrate Judge


Under Local Rule 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **October 28, 2011,** a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.   Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.   A party may respond to the

objecting party's brief within **fourteen days** after service thereof.  All briefs filed under this rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions of the Report to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within **ten days** of receipt of the Report.